# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| WILLIE WELLS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 16-cv-08405 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| GHALIAH OBAISI, Independent Executor ) | |
| of the Estate of Saleh Obaisi, Deceased, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Willie Wells is a prisoner in the custody of the Illinois Department of Corrections. Wells claims he ingested paint chips that fell into a cup in his cell while he was housed at Stateville Correctional Center ("Stateville") in January 2015 and experienced pain and suffering as a result. He further claims that Stateville's medical director, Dr. Saleh Obaisi knew about his condition but refused to see him until November 2015. Accordingly, Wells sued Dr. Obaisi under 42 U.S.C. § 1983 claiming that the doctor was deliberately indifferent to his objectively serious medical condition in violation of his rights under the Eighth Amendment. Ghaliah Obaisi ("Defendant"), the independent executor of Dr. Obaisi's estate who was substituted as the named defendant upon Dr. Obaisi's death, has now moved for summary judgment. (Dkt. No. 91.) Wells, meanwhile, has moved to strike an expert report offered by Defendant in support of the summary judgment motion. (Dkt. No. 100.) For the reasons that follow, Defendant's summary judgment motion is granted and Wells's motion to strike is granted in part and otherwise denied as moot.

**BACKGROUND**

Except when otherwise noted, the following facts are undisputed.

During the relevant time period, Wells was incarcerated at Stateville, where Dr. Obaisi served as the medical director. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ("PRMF") ¶¶ 1–3, Dkt. No. 101.) The events at issue occurred after Wells filled a cup with water in his cell on January 9, 2015. (*Id.* ¶ 5.) When he drank the water, Wells felt something in his throat and so he spit out the water, which had paint chips visible in it. (*Id.*) Wells felt a sharp pain in his throat, and later the same day, he began to cough up blood. (*Id.* ¶¶ 5–6.) For a long period afterward, he suffered throat and stomach pain, as well as other symptoms. (Wells Dep. at 76:14–24, Def.'s Ex. 4, Dkt. No. 92-4.) Wells later testified during discovery that he continued to spit up blood every day for a "great while." (Def.'s Resp. to Pl.'s Statement of Additional Material Facts ("DRMF") ¶ 4, Dkt. No. 104.)

From January 2015 to November 2015, Wells repeatedly reported that he felt something in his throat and had blood in his saliva—symptoms he did not experience until after he had ingested the paint chips. (Wells Dep. at 103:1–11, 122:2–8, 161:17–162:1.) Throughout that period, Wells sought to see Dr. Obaisi. (DRMF ¶ 13.) He informed nursing staff and prison guards about his need to see the doctor, and he submitted medical requests and grievances asking to be seen. (*Id.* ¶¶ 13, 16.) According to Wells, beginning in January 2015, prison medical staff repeatedly told him that they would bring his concerns to Dr. Obaisi's attention, and one nurse told him that she had actually done so. (Wells Dep. at 18:3–18, 51:12–23, 52:8–14, 54:3–8, 73:2–8, 86:11–87:3, 163:8–11.) Yet Dr. Obaisi did not see Wells for the first time until November 1, 2015—almost ten months after the initial incident with the paint chips. (DRMF ¶ 14.)

Wells tried to schedule medical care immediately after the paint-chip incident. (Wells Dep. at 59:24–60:14.) But he did not see anyone until the end of January 2015—about two weeks after the incident—and then it was a nurse who attended to him. (DRMF ¶ 6.) Wells told the nurse that he was in pain and spitting up blood. (*Id.* ¶ 7.) The nurse advised him to spit up whatever was in his throat (Wells Dep. at 88:11–20), and she gave him milk of magnesia and throat lozenges (PRMF ¶ 22). About a week later, Wells saw a physician's assistant and informed her of his continuing symptoms. (DRMF ¶ 9.) He saw the physician's assistant again for a follow-up appointment later in February, he saw a nurse in June 2015, and he saw the physician's assistant yet again in September 2015. (Sub-Ex. to Ex. 5 at 5, 10, 13, Dkt. No. 94.) It appears that the September 2015 visit with the physician's assistant is what finally precipitated the appointment with Dr. Obaisi on November 1, 2015. (*Id.* at 13.)

At the November 1 appointment, Wells explained the paint-chip incident and accompanying symptoms to Dr. Obaisi. (PRMF ¶¶ 7–8.) Dr. Obaisi diagnosed Wells with an elongated uvula and initiated a referral for Wells to see an outside specialist, which required approval through a collegial review process. (*Id.* ¶¶ 8–9.) On November 10, 2015, Dr. Obaisi got approval for Wells to be seen by ear, nose, and throat specialists at the University of Illinois at Chicago. (*Id.* ¶ 12.) Wells saw those specialists on May 19, 2016. (*Id.* ¶ 13.) Wells admits that he has no knowledge of Dr. Obaisi delaying his appointment with the specialists. (*Id.* ¶ 15.)

The specialists found signs of acid reflux, but nothing they told Wells connected the acid reflux to the paint chips. (*Id.* ¶¶ 17–18.) They did not see any objects lodged in Wells throat. (PRMF ¶ 34.) They diagnosed Wells with gastroesophageal reflux disease and globus sensation, and they recommended anti-reflux medication. (*Id.* ¶ 37.) The specialists could not offer an opinion on whether any delay in treatment caused or contributed to those conditions. (*Id.* ¶ 40.) To

the contrary, in a deposition, one of the specialists later testified that ingesting paint chips would not cause the diagnosed conditions. (Sweis Dep. at 30:16–20, 39:9–18, Ex. 8, Dkt. No. 92-8.)

A few months after his appointment with the specialists, Wells filed his lawsuit *pro se* under § 1983, naming Dr. Obaisi as the only defendant. The Court recruited *pro bono* counsel for Wells, who then filed an amended complaint alleging that Dr. Obaisi had violated Wells's Eighth Amendment rights through his deliberate indifference to an objectively serious medical condition. The amended complaint alleges that Dr. Obaisi was deliberately indifferent in eight ways. (*See* Am. Compl. ¶¶ 88(a)–(h), Dkt. No. 17.) Seven of those allegations relate to the delay between the paint-chip incident and Dr. Obaisi's treatment of Wells. (*See id.* ¶¶ 88(a)–(f), (h).) The final allegation asserts that Dr. Obaisi misdiagnosed Wells when he attributed his symptoms to an elongated uvula. (*Id.* ¶ 88(g).)

## DISCUSSION

### I. Motion for Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment will be denied only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. However, a nonmoving party "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.

A prisoner claiming deliberate indifference in violation of his Eighth Amendment rights must establish that he "had a serious medical condition" and "the defendants were deliberately

indifferent to it." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001). The medical condition must be objectively serious, *i.e.*, "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* Moreover, deliberate indifference to a serious condition requires "more than mere negligence." *Id.* Instead, the prisoner must show that the prison official "was subjectively aware of the prisoner's serious medical needs and disregarded an excessive risk that a lack of treatment posed" to the prisoner. *Id*. Thus, what the prison official knew and when he knew it is key to resolving a deliberate indifference claim. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

In addition, "[a] delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010); *see also Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010); *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). But for a deliberate indifference claim regarding a delay in treatment, the prisoner must identify "verifying medical evidence" in the record to establish that the delay harmed him. *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (internal quotation marks omitted). Verifying medical evidence may come in the form of expert testimony or records of diagnosis and treatment. *Williams v. Liefer*, 491 F.3d 710, 714–15 (7th Cir. 2007).

Here, Defendant seeks summary judgment primarily on the ground that there is no triable issue of fact regarding whether Dr. Obaisi knew about Wells's symptoms before he treated Wells on November 1, 2015 and nonetheless delayed treating him. As an alternative basis for summary judgment, Defendant contends that there is no verifying medical evidence in the record

establishing that the delay in treatment harmed Wells. It is worth noting that, at least for present purposes, Defendant does not dispute that GERD (*i.e.*, gastroesophageal reflux disease)—the disease with which Wells was ultimately diagnosed—can "amount[] to an objectively serious medical condition." (Def.'s Reply in Supp. of Mot. for Summ. J. at 2, Dkt. No. 103.)

### A. Dr. Obaisi's Subjective Awareness of Wells's Symptoms

To survive summary judgment, Wells must identify a triable issue of fact as to whether Dr. Obaisi knew about his symptoms before the November 1, 2015 appointment and yet showed deliberate indifference in delaying treatment. Wells offers three reasons why he believes that Dr. Obaisi knew about his symptoms before the November 1 appointment: first, Wells contends that several nurses and a physician's assistant knew about his symptoms and argues that their knowledge should be imputed to Dr. Obaisi because they were acting as his agents; second, Wells claims that at least one nurse told Dr. Obaisi about his symptoms; and third, Wells contends that the grievances and medical requests that he submitted alerted Dr. Obaisi to his symptoms.

Wells's first argument can be dispatched quickly. The medical personnel in this case worked for Wexford Health Sources, Inc. ("Wexford"), the private contractor that provides healthcare services to inmates in the custody of the Illinois Department of Corrections. (Def.'s Ex. 5 at 7, Dkt. No. 92-5.) The nurses and the physician's assistant who saw Wells did not work for Dr. Obaisi, who was also a Wexford employee. In some circumstances, the knowledge of nurses and physician's assistants might be properly imputed to Wexford, their employer and principal, under agency law. *See* Restatement (Third) of Agency § 5.03 (Am. Law Inst. 2006). But there is no legal basis to impute their knowledge to Dr. Obaisi, who was also an agent of Wexford, not a principal for the medical personnel. *See Higgins v. Corr. Med. Servs. of Ill., Inc.*, 8 F. Supp. 2d 821, 828–30 (N.D. Ill. 1998) (declining to impute knowledge from one medical professional to

another in a deliberate indifference case). Imputing knowledge to Dr. Obaisi would improperly subject him to liability based on a theory of supervisory liability or *respondeat superior*. But § 1983 only imposes liability on a person who actually "subjects, or causes to be subjected" any other person to a deprivation of federal rights—that is, the statute requires a defendant's own personal involvement in the alleged violation; *respondeat superior* liability does not exist for purposes of § 1983. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 692–93 (1978). The Court thus finds Wells's first argument unpersuasive.

Wells's second argument relies on his deposition testimony that a nurse told him that she told Dr. Obaisi about his symptoms but Dr. Obasi refused to see him. Wells testified that when Nurse Michelle Miller first saw him, she "went directly to the Health Care to, you know, pass the information on to Dr. Obaisi." (Wells Dep. at 18:14–16.) According to Wells, Nurse Miller told him later that "[Dr. Obaisi] refused to see me." (*Id.* at 18:18.) Wells described this incident two other times in his deposition. At one point, he testified that "[a]fter I spoke with Nurse Miller, she went to the Health Care Unit to relay the information to Dr. Obaisi." (*Id.* at 51:12–14.) And at another point, he testified that "she explained to me that she presented Dr. Obaisi, you know, with my information, explained the situation, and he blatantly told her no, that that [*sic*] he wouldn't see me." (*Id.* at 86:23–87:3.) Wells admitted, however, that he did not know "word for word" what Nurse Miller told Dr. Obaisi. (*Id.* at 87:12.) He could only state that "[s]he just said she explained what I explained to her." (*Id.* at 87:12–13.) Wells does not know why Dr. Obaisi thought it was unnecessary to see him. (*Id.* at 87:21.) He was never present when Nurse Miller and Dr. Obaisi spoke. (*Id.* at 52:24.) And he never saw any paperwork documenting a conversation between the nurse and the doctor. (*Id.* at 54:13, 55:1.)

In considering whether this testimony from Wells creates a triable issue of fact, the Court first must address whether such testimony could be admitted at trial. While evidence need not be in an admissible form at the summary judgment stage, it must be admissible in some form at trial.[1] *See, e.g.*, *Hartzol v. McDonald's Corp.*, 437 F. Supp. 2d 805, 808 (N.D. Ill. 2006). Here, the proffered evidence of what Nurse Miller told Wells that Dr. Obaisi told her constitutes inadmissible hearsay that likely could not be admitted at trial in any form.

To begin, it is clear that the out-of-court statements by Nurse Miller are being offered for the truth of the matter asserted—*i.e.*, that Nurse Miller actually told Dr. Obaisi about Wells's symptoms and yet Dr. Obaisi refused to see Wells—so those statements are hearsay. Fed. R. Evid. 801(c). Furthermore, any statements that Nurse Miller attributed to Dr. Obaisi are hearsay within hearsay (to the extent offered for the truth of what Dr. Obaisi said),[2] and each level of hearsay must be admissible for the entire statement to be admitted at trial. Fed. R. Evid. 805. The Court will assume that the underlying statements by Dr. Obaisi would be admissible at trial as admissions of a party-opponent, Fed. R. Evid. 801(d)(2)(A), or possibly under the exception to the hearsay rule for statements of a then-existing state of mind, Fed. R. Evid. 803(3). But the repeating of any such statements by Nurse Miller to Wells does not appear to fall under any exception to the hearsay rule.

Statements by Nurse Miller are not statements of a party-opponent, as she is not a party to this suit, nor was she Dr. Obaisi's agent or employee, *see* Fed. R. Evid. 801(d)(2)(D); there is no

---

[1] The Court has discretion to disregard evidence for purposes of summary judgment if the evidence could not be admitted in any form at trial. *See Payne v. Pauley*, 337 F.3d 767, 775 (7th Cir. 2003) ("We have ignored certain facts from [the plaintiff's] various iterations either because they are not relevant . . . or because the evidence is not admissible.").

[2] The Court notes that certain of Dr. Obaisi's statements could also be offered for purposes other than the truth of the matters asserted.

evidence that she and Dr. Obaisi engaged in a conspiracy, *see* Fed. R. Evid. 801(d)(2)(E); and there is insufficient evidence that she was "authorized to make a statement on the subject." Fed. R. Evid. 801(d)(2)(C). Regarding the last point, while the statements attributed to Dr. Obaisi could possibly be read as suggesting that Dr. Obaisi authorized Nurse Miller to relay a message to Wells, Federal Rule of Evidence 801 makes clear that, for purposes of the rule, "[t]he statement must be considered but does not by itself establish the declarant's authority" to make a statement on a party-opponent's behalf. *See* Fed. R. Evid. 801(d)(2). And beyond the statement itself, there is no evidence that Dr. Obaisi authorized Nurse Miller to relay a message to Wells. In fact, Nurse Miller testified in her deposition that it would be contrary to ordinary practice for a nurse to relay a message from the doctor and that she had never verbally relayed information about treatment from Dr. Obaisi to a patient. (Miller Dep. at 20:15–17, Def.'s Ex. 5, Dkt. No. 92-5.)

The other plausible theories of admissibility for Nurse Miller's statements would appear to be the hearsay exception for statements made for medical diagnosis or treatment, *see* Fed. R. Evid. 803(4), and the residual exception, Fed. R. Evid. 807. The hearsay exception for statements made for medical diagnosis or treatment would not apply, however, because that exception exists for statements that are "reasonably pertinent to a physician in providing treatment." *Cook v. Hoppin*, 783 F.2d 684, 690 (7th Cir. 1986); *see* Fed. R. Evid. 803(4) (covering "[a] statement that: (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause"). The exception assumes that patients normally tell the truth to healthcare providers to secure adequate medical treatment. *See White v. Illinois*, 502 U.S. 346, 355 (1992). Statements by healthcare providers about scheduling do not have the same indicia of trustworthiness and do not fall within the exception. With respect to the residual exception, the Court sees no basis from

which to conclude that the statements Wells claims Nurse Miller made to him exhibit the "equivalent circumstantial guarantees of trustworthiness" of statements that fall under ordinary hearsay exceptions. Fed. R. Evid. 807. Because the alleged statements from Nurse Miller are unlikely to be admitted at trial, this Court will not consider them the summary judgment stage.

Wells's third argument assumes that Dr. Obaisi must have known about Wells's symptoms because he submitted numerous grievances to prison administrators and he submitted medical requests to be seen by Dr. Obaisi. Wells has included his grievances in the summary judgment record but not the medical request forms. Defendant contends that the Court should not consider the grievances or Wells's statements about the medical requests because both constitute inadmissible hearsay. And perhaps if the documents were being offered for the truth of the matters asserted in them—*i.e.*, that Wells was suffering certain symptoms on particular days, for example—those statements likely would not be admissible. But Wells seeks to rely on the documents for the purpose of demonstrating that Dr. Obaisi had notice of Wells's symptoms and requests to be seen—that is, to show their effect on the recipient. The contents of the documents likely would be admissible for that purpose. *See, e.g.*, *United States v. Shaw*, 824 F.3d 624, 630 (7th Cir. 2016) (finding out-of-court statements admissible to demonstrate their effect on the listener).

Nonetheless, the grievances and medical request forms still do not create a triable issue of fact. The grievances all are addressed to prison administrators. While Wells complains in the grievances that Dr. Obaisi has not seen him, the grievances are not addressed to Dr. Obaisi, his signature does not appear on them, and there is no indication that Dr. Obaisi ever saw or heard about them. The same is true with respect to the medical request forms. While the medical request forms, as described by Wells, seek appointments with Dr. Obaisi, the nurses reviewed them.

(Wells Dep. at 63:24–64:5.) Wells has not pointed to any evidence suggesting that Dr. Obaisi saw or knew about the medical requests or even that it was ordinary practice for Dr. Obaisi to review requests from patients seeking appointments with him. While letters addressed to a defendant in some circumstances may support an inference of knowledge, normally it is "not a strong enough inference to survive summary judgment on its own." *Taylor v. Garcia*, No. 11 C 7386, 2015 WL 5895388, at *11 (N.D. Ill. Oct. 6, 2015). Here, the letters were not even addressed to Dr. Obaisi.

In sum, because the record reveals no admissible evidence from which a reasonable jury could conclude that Dr. Obaisi knew about Wells's requests to see him and yet refused to do so, Wells has not identified a triable issue of fact regarding whether Dr. Obaisi acted with deliberate indifference by failing to see him. For this reason, summary judgment is appropriate and there is no need to consider Defendant's argument that Wells has failed to point to verifying medical evidence in the record showing that the delay in treatment harmed him.

### B. Allegation of Misdiagnosis

While Wells's primary complaint concerns the delay between the paint-chip incident and his examination by Dr. Obaisi, Wells also suggests that Dr. Obaisi should be held liable for his faulty diagnosis once he finally saw Wells.

To hold Dr. Obaisi accountable for deliberate indifference based on his alleged misdiagnosis, Wells must show more than mere negligence. *See Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997) ("[The doctor] may have been incorrect in this assessment, but medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim."). Wells must instead show that Dr. Obaisi made a decision that was such "a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that [Dr. Obaisi] actually did not base the decision on such a judgment." *Holloway v.*

*Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). Yet Wells has pointed to no evidence in the record suggesting that Dr. Obaisi deviated from the general medical standard of care, much less that he made a diagnosis based on something other than professional judgment. Even if Dr. Obaisi erred so severely in misdiagnosing Wells's condition that it could qualify as deliberate indifference, Wells cannot establish that he suffered harm as a result—as Dr. Obaisi referred Wells to an outside specialist the same day that he first saw him and did not delay or impede his diagnosis by the specialist.

Therefore, Wells cannot avoid summary judgment by arguing that Dr. Obaisi acted with deliberate indifference with respect to his diagnosis of Wells's condition.

## II. Motion to Strike Expert Report

Before concluding, the Court must also address Wells's motion to strike the expert report of Dr. Robert Wolf, a board-certified internist retained by the defense, which was attached as Exhibit 9 to Defendant's statement of material facts. (*See* Wolf Report, Def.'s Ex. 9, Dkt. No. 92-9.) To be clear, Dr. Wolf's expert report played no role in the Court's decision to grant summary judgment in favor of Defendant. Nonetheless, as certain of his proffered opinions purport to directly address issues resolved above, the Court will touch on those opinions briefly.

As described in his report, Dr. Wolf was retained to "review the medical chart of Mr. Willie Wells as it related to his medical care and treatment while a prisoner in the Illinois Department of Corrections." (Wolf Report at 1.) Wells offers five reasons why this Court should strike Dr. Wolf's report: (1) Dr. Wolf is not qualified to offer an opinion on prison policies, (2) he improperly opines on whether Dr. Obaisi exhibited deliberate indifference, (3) he improperly opines on Dr. Obaisi's state of mind, (4) he improperly adopts the opinion of others as his own, and (5) he fails to offer an explanation for his methodology. Dr. Wolf's proffered exert opinions

suffer from several deficiencies. But in light of the basis for the Court's conclusion that summary judgment must be granted—that there is no evidence Dr. Obaisi was subjectively aware of Wells's condition and yet deliberately delayed seeing him—the Court here addresses only the opinions and objections directly relevant to that conclusion.

Specifically, in his report, Dr. Wolf opines that "Dr. Obaisi . . . did not deliberately withhold nor refuse any treatments" and further concludes "within a reasonable degree of medical certainty . . . Dr. Obaisi conducted his medical care without deliberate indifference." (Wolf Report at 6–7.) The Court agrees with Wells that these opinions are improper. The first statement is not so much an "expert" opinion as a factual statement about what Dr. Obaisi did or did not do by a witness without personal knowledge of the facts. *See* Fed. R. Evid. 602. The second statement constitutes an opinion on the ultimate issue. While such an opinion is not necessarily improper, *see* Fed. R. Evid. 704(a), the Court sees no reason why the opinion would help the trier of fact to understand the evidence or to determine a fact in issue in this case, which is a prerequisite for admissibility of expert testimony, *see* Fed. R. Evid. 702(a). Particularly, as those opinions relate to the issues of (1) whether Dr. Obaisi was subjectively aware of Wells's condition and requests to be seen but deliberately ignored him, and (2) whether Dr. Obaisi's misdiagnosis rose to the level of deliberate indifference given the prompt referral to a specialist and lack of any harm to Wells resulting from it, Dr. Wolf's expert opinions are unlikely to aid the trier of fact and thus are properly stricken. The motion to strike is denied as moot as to the other objections.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 91) is granted and Wells's motion to strike (Dkt. No. 100) is granted in part and otherwise denied as moot. The Clerk will enter Judgment in favor of Defendant and this case will be closed.

ENTERED:

Dated: March 26, 2020

Andrea R. Wood
United States District Judge